## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANGELA CAIN,**<br>**13548 Jamieson Place**<br>**Germantown, MD 20874** ) ) ) ) | |
| *Plaintiff,* ) ) | **CIVIL ACTION NO.** |
| **v.** ) ) | **1:25-cv-640** |
| **FORT MYER CONSTRUCTION** )<br>**CORPORATION,** )<br>**2237 33rd Street** )<br>**Washington, DC 20018** ) | **JURY TRIAL DEMANDED** |
| *Defendant.* ) ) | |

---

## COMPLAINT

---

Plaintiff Angela Cain ("Ms. Cain") brings this Complaint against Defendant Fort Myer Construction Corporation ("Defendant" or "the Company" or "FMCC") to redress violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the D.C. Human Rights Act, D.C. Code §2-1402 ("DCHRA").

### NATURE OF CLAIMS

1.     FMCC hired Ms. Cain—a highly accomplished female financial executive with over 20 years of experience—as its Director of Payroll in December 2023. Despite Ms. Cain's extensive qualifications and proven track record, FMCC subjected her to offensive gender-based comments, differential treatment based on gender, and paid Ms. Cain $75,000 a year less than her similarly-situated male colleagues for performing similar work. Throughout her employment, Ms. Cain continually complained to FMCC leadership about the Company's discriminatory pay practices and inappropriate gender-based behavior by senior leadership. Still, FMCC failed to take

meaningful remedial action and instead retaliated against Ms. Cain by removing her from significant projects and subjecting her to unwarranted performance criticism—criticism that did not exist prior to her complaints about gender pay equity. Then, in April 2024, FMCC terminated Ms. Cain's employment under pretextual claims of poor performance, despite her extensive qualifications, significant contributions, and in direct contradiction of the Company's own documented praise for her work. FMCC's discriminatory and retaliatory actions violate Title VII and the DCHRA.

## PARTIES

2.      Plaintiff, Ms. Cain, is a resident of Maryland. FMCC employed Ms. Cain from December 2023 until April 2024. At all times relevant to this Complaint, Ms. Cain primarily performed work for FMCC in the District of Columbia.

3.      Defendant, FMCC, is a corporation with its principal place of business located in Washington, D.C.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts federal law claims under Title VII of the Civil Rights Act of 1964.

5.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiff's claims are brought to recover damages for deprivation of equal rights.

6.      This Court has supplemental jurisdiction to hear Plaintiff's claims brought pursuant to the laws of the District of Columbia pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)–(c) because Defendant conducts business in this district, and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district.

## ADMINISTRATIVE REMEDIES

8.      Ms. Cain filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 30, 2024, alleging gender discrimination and retaliation. **(Exhibit A).**

9.      After more than 180 days, the EEOC issued Ms. Cain a Notice of Right to Sue on February 27, 2025. **(Exhibit B).**

10.     Ms. Cain brings this action less than 90 days after her receipt of the Notice of Right to Sue and has exhausted all necessary administrative remedies.

## FACTUAL ALLEGATIONS

11.     FMCC hired Ms. Cain on December 11, 2023, as its Director of Payroll.

12.     Ms. Cain directly reported to Anthony DiFerdinando ("Mr. DiFerdinando"), FMCC's Chief Financial Officer.

13.     As Director of Payroll, Ms. Cain led the payroll department, ensuring accurate and timely paychecks for over 700 FMCC employees, contractors, and staff. Ms. Cain also directly managed six team members, including two payroll managers, two payroll processors, and two payroll assistants.

14.     Under Ms. Cain's leadership, the department successfully handled paycheck distribution, payroll tax compliance, W-2 issuance, and the management of retirement fund contributions, workers' compensation rate adjustments, and tax payments.

15.     Throughout her employment, Ms. Cain worked diligently to rectify outdated or incorrect payroll processes and ensure FMCC's compliance with all relevant laws and regulations.

16.     FMCC leadership routinely praised Ms. Cain's  efforts to improve the Company's operations. For instance, in February 2024, Ms. Dora Rodriguez ("Ms. Rodriguez"), an FMCC

Executive Officer and Board of Directors member, praised Ms. Cain for re-writing several poorly written Company policies.

17.    Notably, FMCC does not issue formal or written performance reviews to its employees. Nevertheless, Ms. Cain's coworkers and executives in the Company, such as Ms. Rodriguez, praised Ms. Cain's work performance and her efforts to improve and correct the Company's payroll processes.

### FMCC Paid Ms. Cain Less Than Her Similarly-Situated Male Colleagues.

18.    FMCC employs approximately 5-7 Directors. Ms. Cain was the only female Director at the Company, and FMCC paid her substantially less than it paid the male Directors.

19.    Ms. Cain's salary at FMCC was $175,000 annually.

20.    During December 2023, Ms. Cain reviewed the payroll data for the other Directors. Because she was the Director of Payroll, she was able to see and view Company payroll data.

21.    Upon her review, Ms. Cain observed that out of 5-7 male Directors, she was the only female Director and the lowest paid.

22.    For example, FMCC hired Scott Reinhard ("Mr. Reinhard") as the Director of Accounting and Finance approximately two weeks before it hired Ms. Cain.

23.    FMCC pays Mr. Reinhard an annual salary of $250,000–which is $75,000 more annually than FMCC paid Ms. Cain.

24.    Both Mr. Reinhard and Ms. Cain directly reported to Mr. DiFerdinando and were Directors in Company's financial department.

25.    Mr. Reinhard and Ms. Cain performed some similar job duties and often collaborated and worked together on projects.

26.    For example, FMCC assigned Mr. Reinhard and Ms. Cain to work together to compile data for the Company's 401k audits and the Office of Federal Contract Compliance Programs ("OFCCP") audit.

27.    Ms. Cain and Mr. Reinhard also had overlapping duties and both performed financial account reconciliation work and system integration work. As described below, FMCC assigned Ms. Cain projects to start and then asked Mr. Reinhard to complete the projects.

28.    Ms. Cain and Mr. Reinhard were in constant communication, spoke frequently, and worked collaboratively on the Company's financial tasks.

29.    Ms. Cain and Mr. Reinhard performed extremely similar work, often working together on the same projects, sharing projects, and overlapping duties.

30.    Ms. Cain and Mr. Reinhard were equally qualified for their roles at FMCC.

31.    Despite their equal qualifications and the similar work they performed, FMCC paid Mr. Reinhard an annual salary of $250,000, while only paying Ms. Cain $175,000 annually.

32.    There was no legitimate, non-discriminatory for this pay differential. FMCC paid Ms. Cain substantially less than her similarly-situated male counterparts because of her gender.

33.    Additionally, FMCC also did not have any policies in place to determine employee compensation. This lack of policies permitted executives to use bias and other illegal factors—like an employee's status in a protected class—to determine employees' pay.

34.    FMCC also insisted on keeping salaries "secret," which prevented transparency and inhibited Ms. Cain's efforts to pursue equitable and equal pay rates throughout the Company.

35.    For example, Mr. DiFerdinando was adamant and informed Ms. Cain that the Company's Human Resources ("HR") could not know the salaries of the Company's executives

or administrative staff. This meant that the very branch of the Company tasked with ensuring a fair and equitable workplace (HR), had no way to evaluate discriminatory pay practices.

36.     Ms. Cain spoke with Mr. DiFerdinando on multiple occasions during December 2023 and January 2024 about the problems caused by keeping all administrative staff salaries "secret." Ms. Cain asked Mr. DiFerdinando to consolidate the payroll systems to create more transparency and accountability.

37.     Mr. DiFerdinando continued to insist that HR could not know the salaries of administrative employees.

38.     Based on Mr. DiFerdinando's actions, it was clear that he was adamant about maintaining FMCC's discriminatory pay practices and intentionally refused Ms. Cain's urging to implement transparent and equitable pay policies.

39.     During one conversation with Mr. DiFerdinando in February 2024, Ms. Cain informed him that FMCC's policies did not conform to equal pay standards and again requested permission to start better aligning FMCC's policies with applicable laws, like the Equal Pay Act.

40.     In response to Ms. Cain, Mr. DiFerdinando became very upset, defensive, and belligerent.

41.     During a conference call in February 2024, Ms. Cain again brought up the topic of equal pay with Alissa Horvitz ("Ms. Horvitz"), one of FMCC's attorneys with Mr. DiFerdinando present. Mr. DiFerdinando responded, "This is America, isn't it? We can pay people whatever we want!"

42.     Ms. Cain tried to explain that FMCC had to comply with relevant laws prohibiting pay discrimination, but Mr. DiFerdinando refused to listen.

43.    FMCC knew about the inequitable gender-based pay practices within the Company and did nothing to remedy its illegal pay policies.

**FMCC Subjected Ms. Cain to Adverse Terms and Conditions of Employment Because of Her Gender and in Retaliation for Her Complaints About the Company's Discriminatory Pay Practices.**

44.    In addition to paying Ms. Cain less than its male Directors, FMCC subjected Ms. Cain to adverse terms and conditions of employment based on her gender.

45.    During Ms. Cain's first week of employment with FMCC, both of the payroll managers whom she directly supervised, Lydia Ramirez ("Ms. Ramirez") and Adela Miranda ("Ms. Miranda") warned Ms. Cain that FMCC was a "man's company" and "women weren't well respected."

46.    Ms. Cain quickly observed that this was true and that FMCC did not pay, listen to, credit, or respect women equally compared to men.

47.    Throughout Ms. Cain's employment, Mr. DiFerdinando made inappropriate gender-based and dismissive comments about Ms. Cain.

48.    These escalated and increased after Ms. Cain complained to Mr. DiFerdinando about the Company's discriminatory and illegal pay practices.

49.    For example, in February 2024, Mr. DiFerdinando and Ms. Cain were discussing progress on a task that Ms. Cain was working on. Mr. DiFerdinando said that he had been unable to make progress on the task but, "maybe [Ms. Cain's] pretty face could get things done."

50.    This interaction made Ms. Cain extremely uncomfortable because Mr. DiFerdinando was commenting on her physical appearance and suggesting that she would use her physical appearance rather than her skill to accomplish tasks at work.

51.     Ms. Cain was reasonably very offended and upset by this comment. Mr. DiFerdinando did not make similar comments to male employees.

52.     Additionally, in February 2024, Mr. DiFerdinando subjected Ms. Cain to hostile treatment after she explained to him for the third or fourth time that she could not reconcile the General Ledger account. The General Ledger account had been used to give loans to employees since 2020 and had never been properly reconciled.

53.     Ms. Cain explained that, prior to her employment with FMCC, no one had properly tracked or reconciled the account, making it impossible for her to perform a proper and accurate reconciliation. In response, Mr. DiFerdinando became extremely hostile and aggressive, raised his voice, berated Ms. Cain for being unable to reconcile the ledger, and threatened to involve HR.

54.     Kent Li ("Mr. Li"), FMCC's Controller, was present for this conversation and confirmed that no one at FMCC had ever been able to reconcile this account in the past, including FMCC's accounting consultant, Diane Judd ("Ms. Judd"). Mr. DiFerdinando did not yell or scream at male employees who were unable to complete impossible tasks.

55.     At the end of the meeting, Mr. DiFerdinando removed Ms. Cain from another project, to which she had devoted significant effort, yelling, "You're done! I'm giving it to Scott [Mr. Reinhard]." Ms. Cain had been diligently working on the project for weeks and had completed all the necessary steps on the project – all that was left was for Mr. Reinhard to fax a letter that Ms. Cain had written.

56.     Ms. Cain was humiliated that she had effectively completed a project, but Mr. DiFerdinando refused to credit or acknowledge her work and instead re-assigned the project to Mr. Reinhard, a male employee, to complete.

57.    Mr. DiFerdinando did not berate male colleagues and did not remove projects from male Directors.

**Ms. Cain Engaged in Protected Activity by Complaining to HR and FMCC's Attorney About Mr. DiFerdinando's Discriminatory Behavior and FMCC's Decision to Pay Her Less than Male Directors.**

58.    That same day, Ms. Cain called Milton Hardy ("Mr. Hardy"), FMCC's Director of Human Resources, and complained about Mr. DiFerdinando's hostile and discriminatory treatment. Mr. Hardy said he would speak to Mr. DiFerdinando; however, Mr. DiFerdinando's conduct persisted.

59.    Following the meeting with Ms. Cain and Mr. DiFerdinando, Ms. Miranda came to Ms. Cain's office visibly upset after witnessing Mr. DiFerdinando yelling at Ms. Cain.

60.    Ms. Miranda expressed her concerns and urged Ms. Cain to remain at FMCC, emphasizing the importance of Ms. Cain's efforts to improve the work environment for all women and minorities employment by the Company. Ms. Cain reassured Ms. Miranda that she had no intention of resigning.

61.    Ms. Miranda and other payroll department employees shared that Mr. DiFerdinando had also treated another female employee, who worked at FMCC prior to Ms. Cain's tenure, in a similar manner.

62.    For example, they described how Mr. DiFerdinando frequently yelled at a female employee named Joanne Toenjes ("Ms. Toenjes") and eventually terminated her employment after she voiced complaints about his behavior.

63.    Ms. Cain told Ms. Miranda that she felt Mr. DiFerdinando was very misogynistic and did not view women as equal to men.

64.     On March 19, 2024, Ms. Cain had a call with Connie Bertram ("Ms. Bertram"), one of FMCC's attorneys, and explained her concerns about pay inequality in the Company and how FMCC lacked the basic systems to comply with wage and hour and employment laws.

65.     Furthermore, Ms. Cain also complained about her own pay, telling Ms. Bertram that she was the "underpaid woman" of the Directors.

66.     Ms. Bertram acknowledged that FMCC's practices and policies needed to be updated and said she would meet with Ms. Cain soon about Ms. Cain's concerns.

## FMCC Terminated Ms. Cain's Employment Because of Her Gender and Her Protected Activity.

67.     On April 8, 2024—a mere two and a half weeks after Ms. Cain complained to Ms. Bertram—FMCC terminated Ms. Cain's employment for pretextual reasons.

68.     First, on April 8, 2024, Ms. Bertram and Mr. DiFerdinando met with Ms. Cain to discuss alleged performance concerns. Specifically, they reprimanded her for inquiring into the 401(k) compliance issues and for working on the Company's pay bands without permission.

69.     Ms. Cain clarified that she had never worked on pay bands and informed them of the same. She was then placed on a 60-day probationary status and given a list of items to complete within that timeframe. Most of the tasks were either already done or near completion.

70.     For example, Mr. DiFerdinando listed resolving the incorrect workers' compensation codes and rates issue as a task that she needed to complete but had not yet accomplished. This was an issue that Ms. Cain had discovered and taken the initiative to fix, yet Mr. DiFerdinando tried to suggest it was a task he had assigned to her and she had not completed. However, Ms. Cain had already resolved the issue.

71.     As another example, Mr. DiFerdinando criticized Ms. Cain by stating that the required quarterly filings had not been completed. However, the quarterly filings were not yet due. The quarterly filings were due on April 30, 2024, and the meeting occurred on April 8, 2024.

72.     In the last week of March, Ms. Cain informed Mr. DiFerdinando that she was waiting to confirm no additional payroll payments were made through March 31, 2024, before starting the quarterly filings. Mr. DiFerdinando never provided this confirmation and yet accused Ms. Cain of not doing her job.

73.     Ms. Cain pointed out that the Company had never given her a list of duties she was required to complete. In response, Mr. DiFerdinando stated that, as a Director, she should have just known what was expected. He then claimed that Mr. Li was forced to perform Ms. Cain's job duties for her. Ms. Cain asked for specific examples several times, but Mr. DiFerdinando could not provide any.

74.     Eventually, Mr. DiFerdinando brought up the General Ledger loan reconciliation issues as alleged evidence that Ms. Cain was not performing her job. Ms. Cain reminded him that, like her, Mr. Li was also unable to reconcile the account because of its previous mismanagement and had been forced to write off the remaining difference.

75.     Thereafter, Ms. Bertram asked Ms. Cain to sign the probationary document and stated that they would meet again the following morning. Prior to Ms. Cain's protected activity, no one at FMCC criticized her work performance or the timeliness of her completing assignments.

76.     Additionally, FMCC did not discipline male employees, such as Mr. Reinhard or Mr. Li, for alleged deficiencies, including their inability to reconcile the General Ledger.

77.     About an hour later, Mr. DiFerdinando returned to Ms. Cain's office and asked her to come to the conference room, where he, Ms. Bertram, and Mr. Hardy were present. Mr.

DiFerdinando, Ms. Bertram, and Mr. hardy then accused Ms. Cain of lying about her status as a 401(k) administrator.

78.    Ms. Cain reminded Mr. DiFerdinando that he had designated her as a 401(k) administrator in February 2024 and highlighted her consistent handling of 401(k) tasks and attendance at an ERISA webinar, which he was aware of.

79.    Despite this, Mr. DiFerdinando, Ms. Bertram, and Mr. Hardy accused Ms. Cain of "lying" about her role and other matters, and claimed the Company could no longer trust her and her employment would be terminated.  When Ms. Cain requested clarification on what alleged "lies" she had told, no one could provide any specific examples.

80.    Prior to Ms. Cain's complaints about inequitable pay and disparate treatment, no one at FMCC ever accused her of "lying" or criticized her work performance.

81.    Additionally, FMCC did not criticize or discipline male employees who actually "lied" during their employment. For example, Mr. DiFerdinando had been holding himself out as a licensed Certified Public Accountant ("CPA") since 1985. However, his licensure expired in 1986 and he was not a CPA. Mr. Hardy confronted Mr. DiFerdinando about the misrepresentation and asked Mr. DiFerdinando to stop using the "CPA" designation on Mr. DiFerdinando's social media. Yet, FMCC did not discipline Mr. DiFerdinando (a male), or terminate his employment, because of this "lie."

82.    Ms. Cain was shocked and devastated by the termination of her employment, which was based on pretextual reasons fabricated by FMCC only following her complaints about the Company's discriminatory pay practices and policies.

83.    Ms. Cain had raised concerns with Mr. Hardy in February 2024 and Ms. Bertram on March 19, 2024, and the Company terminated her employment a mere two and a half weeks after her last complaint.

## CAUSES OF ACTION

### COUNT ONE
### Title VII - Gender Discrimination

84.    Plaintiff incorporates by reference paragraphs 11 to 83 as alleged above.

85.    Title VII makes it unlawful to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000(e)-2.

86.    FMCC is an "employer" as defined by Title VII.

87.    Ms. Cain was an "employee" as defined by Title VII.

88.    Ms. Cain was qualified for her role at FMCC. FMCC never issued Ms. Cain any negative performance feedback prior to her complaints about discriminatory pay and practices. Instead, Ms. Cain received praise for her work, including recognition from FMCC senior leadership.

89.    Ms. Cain is a woman and a member of a protected class.

90.    FMCC subjected Ms. Cain to adverse terms and conditions of employment because of her gender.

91.    FMCC denied Ms. Cain equal pay compared to her male coworkers who performed substantially similar job duties. For example, FMCC paid Ms. Cain an annual salary of $175,000 compared to her male colleague, Mr. Scott Reinhard, who was paid $250,000 annually for similar work.

92.    Ms. Cain and Mr. Reinhard were similarly situated in all material aspects: they reported to the same supervisor, worked in the same department and on the same subject-matter, they shared duties and worked collaboratively on projects.

93.    Yet, FMCC paid Mr. Reinhard (male) $75,000 per year more than Ms. Cain (female) for substantially similar work.

94.    FMCC denied Ms. Cain equal authority, recognition, and respect compared to her male coworkers.

95.    For example, neither Mr. Li nor Mr. Reinhard could reconcile the General Leder, but FMCC did not berate Mr. Li or Mr. Reinhard for this deficiency.

96.    Additionally, FMCC subjected Ms. Cain to inappropriate, gender-based comments. Mr. DiFerdinando said that he had been unable to make progress on certain tasks but, "maybe [Ms. Cain's] pretty face could get things done."

97.    Mr. DiFerdinando berated Ms. Cain and engaged in a pattern of belittling and discriminating against female employees, including Ms. Toenjes.

98.    FMCC removed Ms. Cain from significant projects and assigned them to male colleagues, including Mr. Reinhard, despite Ms. Cain's substantial contributions. FMCC did not discriminate against and undermine male Directors in this way.

99.    FMCC terminated Ms. Cain's employment on April 8, 2024, based on pretextual claims of performance deficiencies. FMCC did not terminate male employees for similar or greater alleged deficiencies.

100.    FMCC's allegations that Ms. Cain "lied" during the course of her employment are demonstrably false and pretextual. Ms. Cain never lied about anything during her employment.

101.    Further, FMCC did not terminate the employment of male employees, like Mr. DiFerdinando, for actually "lying" during the course of their employment.

102.    FMCC's decision to terminate Ms. Cain's employment was based on her gender.

103.    FMCC's articulated reasons for terminating Ms. Cain's employment are demonstrably pretextual.

104.    FMCC acted in a willful and wanton manner and in callous disregard for Ms. Cain's federally protected rights.

105.    As a direct and proximate result of FMCC's discriminatory conduct, Ms. Cain has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT TWO
### Title VII – Retaliation

106.    Plaintiff incorporates by reference paragraphs 11 to 83 as alleged above.

107.    Title VII makes it unlawful for an employer to discharge any individual or otherwise discriminate against an employee with respect to their compensation, terms, conditions, or privileges of employment because the employee engages in protected activity and reports acts of discrimination. 42 U.S.C. § 2000e-3(a).

108.    FMCC is an "employer" as defined by Title VII.

109.    Ms. Cain was an "employee" as defined by Title VII.

110.    Ms. Cain engaged in protected activity throughout December 2023 to February 2024 when she complained about FMCC's inequitable and non-transparent pay policies, specifically those which denied women equal compensation with their male counterparts.

111.    Ms. Cain also engaged in protected activity in February 2024 when she complained to FMCC's Human Resources Director, Mr. Hardy, about FMCC's gender-based pay disparities and Mr. DiFerdinando's discriminatory and hostile treatment.

112.    Ms. Cain further engaged in protected activity on March 19, 2024 when she complained to FMCC's attorney, Ms. Bertram, about the Company's discriminatory pay practices, hostile treatment, and the Company's failure to comply with employment laws. During this meeting, Ms. Cain specifically complained that she was the "underpaid woman" at the Company.

113.    Approximately 2.5 weeks after Ms. Cain's complaint to Ms. Bertram, FMCC retaliated against Ms. Cain by terminating her employment on April 8, 2024.

114.    The short temporal proximity between Ms. Cain's protected activity and FMCC's decision to terminate Ms. Cain's employment (2.5 weeks) supports an inference of causation.

115.    FMCC's articulated reasons for terminating Ms. Cain's employment are demonstrably pretextual. Ms. Cain never lied during her employment with FMCC.

116.    Prior to Ms. Cain's complaints to Mr. Hardy and Ms. Bertram, she received positive performance feedback from Company leaders, like Ms. Rodriguez.

117.    Only after Ms. Cain made formal complaints of discrimination, did FMCC create pretextual allegations that she "lied" during her employment with the Company.

118.    FMCC did not terminate the employment of male employees who actually "lied" during their employment, like Mr. DiFerdinando.

119.    FMCC's retaliated against Ms. Cain for her protected activity.

120.    FMCC engaged in a pattern of retaliation and also terminated Ms. Toenjes' employment after she complained about Mr. DiFerdinando's discriminatory and abusive conduct.

121.    FMCC acted in a willful and wanton manner and in callous disregard for Ms. Cain's federally protected rights.

122.    As a direct and proximate result of FMCC's retaliatory conduct, Ms. Cain has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT THREE
### DCHRA – Gender Discrimination

123.    Plaintiff incorporates by reference paragraphs 11 to 83 as alleged above.

124.    The DCHRA states that "it shall be an unlawful discriminatory practice [for employers] to… discriminate, wholly or partially for a discriminatory reason based upon [an individual's] actual or perceived… sex." D.C. Code § 2-1402.11.

125.    "Because the legal standards for establishing [gender discrimination] claims under Title VII and the DCHRA are substantively the same, the Court will analyze [the Plaintiff's] claims under these statutes together." *Burrell v. Shepard*, 321 F. Supp. 3d 1, 9 (D.D.C. 2018) (citing *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999)).

126.    Ms. Cain was qualified for her role at FMCC. FMCC never issued Ms. Cain any negative performance feedback prior to her complaints about discriminatory pay and practices. Instead, Ms. Cain received praise for her work, including recognition from FMCC senior leadership.

127.    Ms. Cain is a woman and a member of a protected class.

128.    FMCC subjected Ms. Cain to adverse terms and conditions of employment because of her gender.

129.    FMCC denied Ms. Cain equal pay compared to her male coworkers who performed substantially similar job duties. For example, FMCC paid Ms. Cain an annual salary of $175,000 compared to her male colleague, Mr. Scott Reinhard, who was paid $250,000 annually for similar work.

130.    Ms. Cain and Mr. Reinhard were similarly situated in all material aspects: they reported to the same supervisor, worked in the same department and on the same subject-matter, they shared duties and worked collaboratively on projects.

131.    Yet, FMCC paid Mr. Reinhard (male) $75,000 per year more than Ms. Cain (female) for substantially similar work.

132.    FMCC denied Ms. Cain equal authority, recognition, and respect compared to her male coworkers.

133.    For example, neither Mr. Li nor Mr. Reinhard could reconcile the General Leder, but FMCC did not berate Mr. Li or Mr. Reinhard for this deficiency.

134.    Additionally, FMCC subjected Ms. Cain to inappropriate, gender-based comments. Additionally, FMCC subjected Ms. Cain to inappropriate, gender-based comments. Mr. DiFerdinando said that he had been unable to make progress on certain tasks but, "maybe [Ms. Cain's] pretty face could get things done."

135.    Mr. DiFerdinando berated Ms. Cain and engaged in a pattern of belittling and discriminating against female employees, including Ms. Toenjes.

136.    FMCC removed Ms. Cain from significant projects and assigned them to male colleagues, including Mr. Reinhard, despite Ms. Cain's substantial contributions. FMCC did not discriminate against and undermine male Directors in this way.

137.    FMCC terminated Ms. Cain's employment on April 8, 2024, based on pretextual claims of performance deficiencies. FMCC did not terminate male employees for similar or greater alleged deficiencies.

138.    FMCC's allegations that Ms. Cain actually "lied" during the course of her employment are demonstrably false and pretextual. Ms. Cain never lied about anything during her employment.

139.    Further, FMCC did not terminate the employment of male employees, like Mr. DiFerdinando, for "lying" during the course of their employment.

140.    FMCC's decision to terminate Ms. Cain's employment was based on her gender.

141.    FMCC's articulated reasons for terminating Ms. Cain's employment are demonstrably pretextual.

142.    FMCC acted in a willful and wanton manner and in callous disregard for Ms. Cain's statutorily protected rights.

143.    As a direct and proximate result of FMCC's discriminatory conduct, Ms. Cain has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## COUNT FOUR
### DCHRA - Retaliation

144.    Plaintiff incorporates by reference paragraphs 11 to 83 as alleged above.

145.    The DCHRA prohibits retaliation, making it unlawful to "coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter." D.C. Code § 2-1402.61.

146.    Ms. Cain engaged in protected activity throughout December 2023 to February 2024 when she complained about FMCC's inequitable and non-transparent pay policies, specifically those which denied women equal compensation with their male counterparts.

147.    Ms. Cain also engaged in protected activity in February 2024 when she complained to FMCC's Human Resources Director, Mr. Hardy, about FMCC's gender-based pay disparities and Mr. DiFerdinando's discriminatory and hostile treatment.

148.    Ms. Cain further engaged in protected activity on March 19, 2024 when she complained to FMCC's attorney, Ms. Bertram, about the Company's discriminatory pay practices, hostile treatment, and the Company's failure to comply with employment laws. During this meeting, Ms. Cain specifically complained that she was the "underpaid woman" at the Company.

149.    Approximately 2.5 weeks after Ms. Cain's complaint to Ms. Bertram, FMCC retaliated against Ms. Cain by terminating her employment on April 8, 2024.

150.    The short temporal proximity between Ms. Cain's protected activity and FMCC's decision to terminate Ms. Cain's employment (2.5 weeks) supports an inference of causation.

151.    FMCC's articulated reasons for terminating Ms. Cain's employment are demonstrably pretextual. Ms. Cain never lied during her employment with FMCC.

152.    Prior to Ms. Cain's complaints to Mr. Hardy and Ms. Bertram, she received positive performance feedback from Company leaders, like Ms. Rodriguez.

153.    Only after Ms. Cain made formal complaints of discrimination, did FMCC create pretextual allegations that she "lied" during her employment with the Company.

154.    FMCC did not terminate the employment of male employees who actually "lied" during their employment, like Mr. DiFerdinando.

155.    FMCC's retaliated against Ms. Cain for her protected activity.

156.    FMCC engaged in a pattern of retaliation and also terminated Ms. Toenjes' employment after she complained about Mr. DiFerdinando's discriminatory and abusive conduct.

157.    FMCC acted in a willful and wanton manner and in callous disregard for Ms. Cain's statutorily protected rights.

158.    As a direct and proximate result of FMCC's retaliatory conduct, Ms. Cain has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a) Declaring that the acts and practices complained of herein are violations of Title VII and the DCHRA;

(b) Enjoining and permanently restraining these violations;

(c) Directing Defendant to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated;

(d) Directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's discriminatory treatment, and to make her whole for all earnings she would have received but for Defendant's discriminatory treatment, including but not limited to wages, pension, interest, and other lost benefits;

(e) Directing Defendant to pay Plaintiff compensatory damages for her mental anguish and emotional distress;

(f) Directing Defendant to pay Plaintiff punitive and liquidated damages;

(g) Directing Defendant to pay Plaintiff nominal damages;

(h) Awarding Plaintiff pre- and post-judgment interest;

(i) Awarding Plaintiff the costs of this action together with reasonable attorneys' fees; and

(j) Granting such other and further relief as this Court deems necessary and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully Submitted,

*/s/ Melissa Washington*
Melissa Washington, Esq.
mw@washingtonfirmpllc.com
*/s/ Ivey Best*
Ivey Best, Esq.
ib@washingtonfirmpllc.com
WASHINGTON LAW FIRM, PLLC
1050 Connecticut Ave NW, Suite 500
Washington, D.C. 20036
(202) 770-3440